**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN BAKER, individually and on behalf of all others similarly situated, | Case No.  5:25-cv-10414 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| MIDI HEALTH, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Kristin Baker brings this action on behalf of herself and all others similarly situated (the "Class Members") against Midi Health, Inc. ("Defendant" or "Midi Health"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

## INTRODUCTION

1.      This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.joinmidi.com (the "Website") and whose electronic communications were intercepted or recorded by third parties Google LLC ("Google") and TikTok Ltd. ("TikTok") (collectively, the "Third Parties").

2.      Defendant "provides patients with personalized care plans that include hormonal and non-hormonal medications, supplements, lifestyle coaching and more."[1] Midi Health is "the fastest growing virtual care clinic focused on women navigating midlife hormonal change and beyond."[2]

3.      Healthcare providers and business associates thereof—including Defendant—are legally required to safeguard patients' confidential and sensitive health information. This means that any data related to patients' symptoms and treatment history, including patient status, must be kept confidential and secure. Given these protections, patients reasonably expect that information related to their medical needs and treatment will remain confidential.

4.      As a HIPAA covered entity, Defendant has legal and ethical duties to protect patient information. Nonetheless, Defendant undermined the importance of safeguarding the identities and personal medical information of individuals seeking women's health services and breached its patients' trust—violating state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA").

---

[1] PR NEWSWIRE, *Midi Health, the Fastest-Growing Virtual Clinic for Perimenopause and Menopause, Raises an Additional $60M in Series B Round - $100M Total Funding to Date - to Transform Women's Healthcare*, https://www.prnewswire.com/news-releases/midi-health-the-fastest-growing-virtual-clinic-for-perimenopause-and-menopause-raises-an-additional-60m-in-series-b-round--100m-total-funding-to-date--to-transform-womens-healthcare-302125839.html.

[2] *Id.*

5.      In pursuit of profit and without regard for patient privacy Defendant aids, agrees with, employs, conspires, or otherwise enables Third Parties to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website, including communications that contain protected health information ("PHI") and personally identifiable information ("PII").  By failing to procure consent before enabling Third Parties to intercept these communications, Defendant violated state and federal law including the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §2511, *et seq*.), the California Invasion of Privacy Act ("CIPA") §§ 631 and 632, and the California Constitution.

## PARTIES

6.      Plaintiff Kristin Baker is an adult resident of Long Beach, California.

7.      At all relevant times, Plaintiff maintained active accounts with Google and TikTok. When creating her accounts with the Third Parties, Plaintiff provided the Third Parties with her PII, including her full name, date of birth, phone number, and email address.  Plaintiff used the same device to access the Website that she did to access her accounts with Third Parties.  Plaintiff was physically in California when she visited the Website.

8.      In or around September 2025, Plaintiff visited the Midi Health Website and scheduled an appointment.  Unbeknownst to Plaintiff, her communications to the Website were intercepted in transit by the Third Parties—as enabled by Defendant—including communications that contained PII, PHI, and sensitive information related to Plaintiff's appointment, including the specific reason she sought an appointment.  Neither Defendant nor the Third Parties procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring.

9.      Defendant Midi Health, Inc. is a Delaware corporation with its headquarters located in Palo Alto, California.  Defendant owns and operates the Website.  Unbeknownst to its users, Defendant chose to install the Google tracking code and TikTok Pixel (collectively "Tracking Technologies") provided by the Third Parties onto its Website to intercept patient information, thereby improving Defendant's marketing efforts.  Had Defendant complied with the law, it would not have benefited from the information and marketing services it received from the Third Parties.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because Plaintiff's claims are so related that they form part of the same case or controversy.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

11.     This Court has personal jurisdiction over Defendant because Defendant purposefully directs its business activities in this district by offering its services to residents of this District and performing services in this District.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

**FACTUAL ALLEGATIONS**

**A.      Overview of the California Invasion of Privacy Act and the Federal Wiretap Act**

13.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

14.     The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

1    15.    Further, as the California Supreme Court has held in explaining the legislative

2    purpose behind CIPA:

3    
4        While one who imparts private information risks the betrayal of his
         confidence by the other party, a substantial distinction has been
5        recognized between the secondhand repetition of the contents of a
         conversation and its *simultaneous dissemination to an unannounced*
6        *second auditor, whether that auditor be a person or mechanical*
         *device.*

7        As one commentator has noted, such secret monitoring denies the
8        speaker an important aspect of privacy of communication—the right
         to control the nature and extent of the firsthand dissemination of his
9        statements.

10    *Ribas*, 38 Cal. 3d at 360-61 (emphasis added) (internal citations omitted); *see also Smith v.*

11    *LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

12    16.    To establish liability under California Penal Code section 631(a), a plaintiff need

13    only establish that the defendant, "by means of any machine, instrument, contrivance, or in any

14    other manner," does any of the following:

15    
16        Intentionally taps, or makes any unauthorized connection, whether
         physically, electrically, acoustically, inductively or otherwise, with
17        any telegraph or telephone wire, line, cable, or instrument, including
         the wire, line, cable, or instrument of any internal telephonic
18        communication system,

19        *Or*

20        Willfully and without the consent of all parties to the communication,
21        or in any unauthorized manner, reads or attempts to read or learn the
         contents or meaning of any message, report, or communication while
22        the same is in transit or passing over any wire, line or cable or is being
         sent from or received at any place within this state,

23        *Or*

24    
25        Uses, or attempts to use, in any manner, or for any purpose, or to
         communicate in any way, any information so obtained,

26        *Or*

27    
28

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

17.     As part of the Invasion of Privacy Act, the California Legislature additionally introduced Cal. Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

18.     A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal Penal Code § 632(c).

19.     Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation of CIPA.

20.     Similar to CIPA, the Federal Wiretap Act ("ECPA") creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[3]

21.     Although the ECPA does not apply if a "person is a party to the communication or one of the parties to the communication has given prior consent to such interception[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[4]

**B.     Health Information is Sensitive and Confidential**

22.     Defendant owns and operates the Website, where patients can book appointments with clinicians who specialize in treating "menopause, perimenopause, and other midlife care concerns, including weight and body changes."[5]

---

[3] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[4] 18 U.S.C. § 2511(c)–(d).

[5] https://joinmidi.zendesk.com/hc/en-us/articles/27719247878555-How-do-I-know-if-Midi-is-right-for-me

23.     Under federal law, healthcare providers—including Defendant—and their business associates may not disclose PII or PHI without their patients' express written authorization.[6]  In this case, PHI includes, but is not necessarily limited to, patient status and patient appointment information.

24.     The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, which establishes the duties healthcare providers and their business associates owe to their patients.  "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[7]

25.     A covered entity violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." [8]

26.     The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

27.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because it is knowingly and intentionally disclosing individually identifiable health information relating to its patients.

28.     Defendant further failed to comply with other HIPAA safeguard regulations as follows:

(a)     Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

---

[6] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[7] U.S. DEPT. OF HEALTH & HUM. SERVS., THE HIPAA PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[8] 42 U.S.C. § 1320d-6.

(b)    Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

(c)    Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

(d)    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

(e)    Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

(f)    Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

29.    HIPAA covered entities, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations.  However, they are not permitted to use these tools in a way that may expose patients' PHI to vendors (as shown below).  As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[9]

30.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For

---

[9] U.S. DEPT. OF HEALTH & HUM. SERVS., USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added).

example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*[10]

31.    Plaintiff and Class Members face the same risks which the government expresses concern over. Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff and Class Members' health appointments when they accessed Defendant's Website to book appointments for women's health related services.

32.    The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

This information might include an individual's medical record number, home or email address, *or dates of appointments, as well as an individual's IP address or geographic location,* medical device IDs*, or any unique identifying code.*[11]

33.    Crucially, the Bulletin continues:

*All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI*, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as *IP address or geographic location*, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus *relates to the individual's past, present, or future health or health care* or payment for care. [12]

---

[10] *Id.* (emphasis added).

[11] *Id.* (emphasis added).

[12] *Id.* (emphasis added).

34.     In July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
> In their letter, both agencies **reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties**. For example, the disclosure of such information could **reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.** [13]

35.     The FTC is unequivocal in its stance.  The FTC has specifically informed HIPAA covered entities, like Defendant, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

---

[13] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (emphasis added).

The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.

For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.

[I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[14]

36.    Therefore, Defendant's conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**C.    Defendant's Misleading Privacy Representations**

37.    Midi does not obtain its users' express prior consent to deploy the Tracking Technologies and intercept users' health-related communications.

38.    When users first access the Midi Website, there is no disclosure concerning Midi's use of the Tracking Technologies, nor the categories of substantive information transmitted to third parties via the Tracking Technologies.

39.    Only after users decide to book an appointment and select a "care concern" for the visit—menopause, perimenopause, or weight—are they prompted to provide biographical information and create an account, including by clicking a box containing a hyperlink to Midi's Privacy Policy.

40.    Midi's Privacy Policy, however, provides misleading and inadequate disclosures concerning Midi's collection and dissemination of protected health information. With respect to "protected health information," for example, the Privacy Policy refers users to the "Medical Groups' Notice of Privacy Practices," but does not provide a link or otherwise direct users to the actual Notice of Privacy Practices. Instead, the Privacy Policy claims, "If your Personal Data is protected health information, we treat the protected health information in accordance with HIPAA and the Notice of Privacy Practices. To the extent this Privacy Policy conflicts with our HIPAA

---

[14] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

obligations or the Notice of Privacy Practices, we comply with HIPAA obligations or the Notice of Privacy Practices." As described in this Complaint, however, Midi discloses its users' individually identifiable health information to third parties for marketing purposes in violation of HIPAA.

41.     Further, Midi's Privacy Policy does not disclose that the Tracking Technologies intercept users' substantive communications with the Midi Website—including, for example, that a user is attempting to book an appointment related to "menopause"—along with unique identifiers used by third-party tech companies to link the website communications to identified users for purposes of ad retargeting.

**D.      Overview of Tracking Technologies**

42.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (*e.g.*, computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

43.     Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

44.     Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request.  HTTP Responses

may consist of a web page, another kind of file, text information, or error codes, among other data.

45.     A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

46.     Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

47.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Tracking Technologies embedded on the Website by Defendant constitutes Source Code and function in a substantially similar way.

**E.    Google's Tracking Technology**

48.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

49.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[15] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

---

[15] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

50.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

51.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

52.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

     1.     *The Google Analytics Tracking Code*

53.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

54.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

55.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[16]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[17]

56.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

57.     In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google Analytics.

58.     Defendant is essentially handing its patients a tapped device.  Once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant, and transmits those communications to third parties like Google.

59.     Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

---

[16] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.

[17] *Id.*

60.     After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

61.     In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

62.     The Website utilizes Google's pixel and SDK.  As a result, Google intercepted patients' interactions on the Website, including their PII and PHI.  Google received at least "Custom Events" and URLs that disclosed the reason for appointments being scheduled by the patient.  Google also received the reason for the appointment as well as additional PII, including the patients' IP address, device information, and User-IDs.

63.     For example, the Website utilizes Google's "cid" or "Client ID" function to identify patients as they navigate the Website.[18]

64.     In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

65.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

66.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they

---

[18] Eduard Kozakov, *What Is Google Client ID In GA4: Detailed Setup Guide For 2024*, Owox, https://www.owox.com/blog/use-cases/google-analytics-client-id.

have installed to generate a unique identifier which can then be used to match a user across websites."[19]

67.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[20]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

68.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[21]

69.    Browser-fingerprints are personal identifiers.  Google Analytics can collect browser-fingerprints from website visitors.

70.    As enabled by Defendant, Google collects vast quantities of consumer data through Google Analytics.

71.    Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

72.    Google then utilizes such information for its own purposes, such as targeted advertising.

### 2.    The DoubleClick API

73.    The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[22]

---

[19] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

[20] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

[21] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

[22] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482?hl=en.

74.     DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[23]   The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[24]

75.     As relevant here, however, data is still sent from the Website to Google through the DoubleClick API, and app developers like Defendants can then use the Google Marketing Platform to manage the data.  This process is akin to a person setting an old e-mail address to automatically forward messages to a new e-mail address, rather than manually updating their contact information on a number of different websites.  Messages would still be sent to the old e-mail address, but would be routed to the same end recipient, the same way data sent to DoubleClick still ends up with Google.

76.     Once integrated into a developer's mobile application, the DoubleClick API allows an app developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.[25]

77.     Once Defendants intercept the Website communications through the DoubleClick API and disclose such information to Google (in real time), Google has the capability to use such information for its own purposes.  "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[26]

---

[23] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google//products/marketingplatform/360/introducing-google-marketing-platform/.

[24] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en

[25] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.

[26] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

78.    For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

79.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

80.    Information from websites, like Defendants' Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

81.    In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

82.    Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendants' Website, and uses it to assist with data analytics, marketing, and targeted advertising.

83.    Google partners with Defendant in its marketing efforts.  The DoubleClick API is employed on the Website in the manner described throughout this Complaint.

**F.    TikTok's Tracking Technology**

84.    TikTok offers a SaaS called the TikTok Pixel, which helps businesses track the performance of their ads by sending information from the business's website to TikTok, who then uses that information to optimize ad campaigns on TikTok and across the internet.[27]

85.    The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

86.    The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads.  By employing TikTok to

---

[27] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel

collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

87.    In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[28]  That information is sent automatically to TikTok.

88.    The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

89.    Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

90.    On each appointment page and booking page on Defendant's Website (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited, an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

91.    When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because TikTok itself is collecting the content of any conversation.  That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

92.    Once TikTok intercepts website communications, it has the capability to use such information for its own purposes.  TikTok's Commercial Terms of Service grant TikTok "a non-

---

[28] *About TikTok Pixel*, TikTok Business Help Center (Mar. 2025) https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2).

exclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[29]

93.    In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

94.    One of TikTok's partners is Midi Health.  The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

**G.    Defendant's Use of the Tracking Technologies**

95.    As enabled by Defendant, the Third Parties—including Google and TikTok—intercept consumers' confidential communications with Defendant on the Website.

96.    Take for example, the TikTok Pixel.  When a patient attempts to book an appointment on the Website, the patient would first be directed to a page where she could select a "care concern for [her] visit." Unbeknownst to the patient, her selection of the "care concern" and attempt to book an appointment would be intercepted by the TikTok Pixel, disclosing her patient status and the reason she sought an appointment (e.g. "perimenopause").

97.    Defendant also included the TikTok Pixel on the account creation page, allowing TikTok and other third parties to identify users' patient status as soon as they create an account.

98.    Nearly identical information is intercepted through Google's tracking technology and disclosed to Google.

99.    By installing the Tracking Technologies on the Website, Defendant enables Third Parties to surreptitiously intercept and obtain information about its patients, including (1) that a

---

[29] *TikTok For Business Commercial Terms Of Service*, TIKTOK FOR BUSINESS, https://ads.tiktok.com/i18n/official/
policy/commercial-terms-of-service (Last updated March 2025).

particular individual was a patient or prospective patient of Defendant; (2) that a particular individual was seeking women's health services; (3) that the named patient searched for information regarding symptoms, treatments, diagnosis, and medications, all related to specific conditions related to women's health; and (4) that the named patient attempted to book an appointment and/or register an account with Defendant.

100.    Third Parties would also know the named patient's location and IP address, among other identifiers associated with the patient's computer or cell phone.

101.    Once received and processed by Third Parties, Defendant knowingly uses the intercepted communications to run marketing campaigns that target consumers based on their activity on Defendant's Website.

102.    In this way, Defendant and Third Parties profit from Plaintiff's and Class Members' sensitive PII and PHI without their express prior consent or authorization.

103.    Defendant deprived Plaintiffs and the Class Members of their privacy rights when it: (a) embedded and implemented the Tracking Technologies, which surreptitiously intercepted, recorded, and disclosed in real-time Plaintiff's and other online patients' and prospective patients' confidential communications and private information; (b) disclosed patients' and prospective patients' protected information to unauthorized third parties; (c) linked particular patients—Plaintiff and the Classes—with their healthcare provider—Defendant —including by revealing Plaintiff's navigation to and use of Midi's account portal; and (c) failed to provide notice to or obtain express prior consent from Plaintiffs and the Class Members to share their PII and PHI with others.

## CLASS ALLEGATIONS

104.    **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

> The **Nationwide Class** that Plaintiff seeks to represent is defined as:
> All individuals residing in the United States who made a purchase, created an account, and/or scheduled an appointment on the website, www.joinmidi.com, during the Class Period.

The **California Subclass** that Plaintiff seeks to represent is defined as:
All individuals residing in California who made a purchase, created an account, and/or scheduled an appointment on the website, www.joinmidi.com, during the Class Period.

105.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

106.    The Nationwide Class and California Subclass are referred to collectively as the "Classes."

107.    Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

108.    Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

109.    **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's records and the records of third-parties Google and TikTok.

110.    **Commonality and Predominance:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes.  The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members.  Such questions include, but are not limited to, the following:

(a)    Whether Defendant's acts and practices violated the ECPA.

(b)    Whether Defendant's acts and practices violated CIPA § 631;

(c)    Whether Defendant's act and practices violated CIPA § 632;

(d)     Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

(e)     Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

111.     **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to Third Parties.

112.     **Adequacy:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

113.     **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

1

## CAUSES OF ACTION

2

### COUNT I
**Violation Of The Electronic Communication Privacy Act,
18 U.S.C. § 2511, *et seq.*
(On Behalf of the Nationwide Class)**

3

4

114.    Plaintiff incorporates by reference the allegations contained in the paragraphs above

5

as if fully set forth herein.

6

115.    Plaintiff brings this claim on behalf of herself and members of the Nationwide

7

Class.

8

116.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional

9

interception of the content of any electronic communication.  18 U.S.C. § 2511.

10

117.    The ECPA protects both sending and the receipt of communications.

11

118.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or

12

electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter

13

119.

14

119.    The transmission of Plaintiff's sensitive and personal information to Defendant's

15

website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

16

120.    The transmission of PII between Plaintiff and Class Members and Defendant's

17

Website with which they chose to exchange communications are "transfer[s] of signs, signals,

18

writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire,

19

radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce"

20

and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

21

121.    The ECPA defines "contents," when used with respect to electronic

22

communications, to "include[] any information concerning the substance, purport, or meaning of

23

that communication."  18 U.S.C. § 2510(8).

24

122.    The ECPA defines an interception as the "acquisition of the contents of any wire,

25

electronic, or oral communication through the use of any electronic, mechanical, or other device."

26

18 U.S.C. § 2510(4).

27

123.    The ECPA defines "electronic, mechanical, or other device," as "any device . . .

28

1   which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5).

2       124.    The following instruments constitute "devices" within the meaning of the ECPA:

3           (a)    The computer codes and programs Defendant and Google used to track

4                  Plaintiff's and Class Members' communications while they were navigating

5                  the Website;

6           (b)    The computer codes and programs Defendant and TikTok used to track

7                  Plaintiff's and Class Members' communications while they were navigating

8                  the Website;

9           (c)    Plaintiff's and Class Members' browsers;

10          (d)    Plaintiff's and Class Members' mobile devices;

11          (e)    Defendant's and Google's web and ad servers;

12          (f)    Defendant's and TikTok's web and ad servers;

13          (g)    The plan that Defendant and Google carried out to effectuate the tracking

14                 and interception of Plaintiff's and Class Members' communications while

15                 they were using a web browser to navigate the Website; and

16          (h)    The plan that Defendant and TikTok carried out to effectuate the tracking

17                 and interception of Plaintiff's and Class Members' communications while

18                 they were using a web browser to navigate the Website.

19      125.    Plaintiff's and Class Members' interactions with Defendant's website are electronic

20  communications under the ECPA.

21      126.    By utilizing and embedding the Tracking Technologies provided by Google and

22  TikTok on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or

23  procured another person to intercept, the electronic communications of Plaintiff and Class

24  Members in violation of 18 U.S.C. § 2511(1)(a).

25      127.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members'

26  electronic communications via the Tracking Technologies provided by Google and TikTok on its

27  website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII, PHI,

28  and sensitive and personal information to Google and TikTok.

128.    Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their medical appointments and purchases.  This confidential information is then monetized for targeted advertising purposes, among other things.

129.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Google and TikTok through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

130.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

131.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

132.    Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[30]

---

[30] 42 U.S.C. § 1320d-6.

133.     Plaintiff's information that Defendant disclosed to Third Parties qualifies as IIHI, and Defendant violated Plaintiff's and Class members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.  Defendant used the wire or electronic communications to increase its profits.  Specifically, Defendant intentionally embedded and used the Tracking Technologies to track and utilize Plaintiff's and Class members' PII and PHI for financial gain.

134.     Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy through Google Analytics and the TikTok Pixel.  Plaintiff and Class members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to Google and TikTok without their knowledge or consent.

135.     As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Subclass)**

136.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

137.     Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

138.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

139.    A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

140.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

141.    To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

142.    At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff and Class Members

143.    Defendant, when aiding and assisting the Third Parties' wiretapping and eavesdropping, intended to help the Third Parties learn some meaning of the content in the URLs and the content the visitor requested.

144.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

(a)    The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.joinmidi.com;

(b)     Plaintiff's and Class Members' browsers;

(c)     Plaintiff's and Class Members' computing and mobile devices;

(d)     Google's web and ad servers;

(e)     TikTok's web and ad servers;

(f)     The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.joinmidi.com;

(g)     The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.joinmidi.com; and

(h)     The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.joinmidi.com.

145.    The information that Defendant transmitted using the Tracking Technologies constituted sensitive and confidential personally identifiable information.

146.    As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting the Third Parties to receive its customers' sensitive and confidential online communications through www.joinmidi.com without their consent.

147.    As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632(a)**
**(On Behalf of the California Subclass)**

148.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

149.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication".

150.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

151.    Plaintiff's and Class Members' communications to Defendant, including their sensitive personal and health information, such as information related to their prescription medications, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

152.    Plaintiff and Class Members expected their communications to Midi Health to be confined to Midi Health due to the confidential nature of those communications.  Plaintiff and Class Members did not expect third parties, specifically Google and TikTok, to secretly eavesdrop upon or record this information and their communications.

153.    Google's tracking technology, i.e., Google Analytics, is an electronic amplifying or recording devices for purposes of § 632.

154.    TikTok's tracking technology, i.e., the TikTok Pixel, is an electronic amplifying or recording devices for purposes of § 632.

155.    By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to Midi Health through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

156.    At no time did Plaintiff or Class Members consent to the Third Parties' conduct, nor could they reasonably expect that their communications to Midi Health would be overheard or recorded by the Third Parties.

157.    Google and TikTok utilized Plaintiff's and Class Members' sensitive personal and health information for their own purposes, including for targeted advertising.

158.    Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

159.    Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts.  Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, by Third Parties, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law.  Plaintiff and Class Members are accordingly entitled to injunctive relief.

<u>**COUNT IV**</u>
**Invasion of Privacy Under California's Constitution**
**(On Behalf of the California Subclass)**

160.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

161.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

162.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

163.    At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

164.    Plaintiff and Class Members had a reasonable expectation that their sensitive and

confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.joinmidi.com.

165.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive confidential online communications.

166.    The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

167.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d)    For statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demand a trial by jury of any and all issues in this action so triable of right.

1    Dated: December 4, 2025                    Respectfully submitted,

2                                               **BURSOR & FISHER, P.A**.

3                                               By: */s/ Sarah N. Westcot*

4                                                       Sarah N. Westcot

5                                               Sarah N. Westcot (State Bar No. 264916)
                                                701 Brickell Avenue, Suite 2100
6                                               Miami, FL 33131
                                                Telephone: (305) 330-5512
7                                               Facsimile: (305) 676-9006
                                                Email: swestcot@bursor.com
8

9                                               *Counsel for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28